ARTHUR STROUGH and Others, Comprising the Mayor and the Board of Trustees of the Village of Canastota, New York, and CARL WEIMER and Others, Constituting the Water Commissioners of the Village of Canastota, New York, Appellants, v. FRANK CONLEY and Others, as Successors in Title of EDWIN BULL and SMITH CADY of the Town of Sullivan, Madison County, New York, and Others, Respondents.

Third Department, July 2, 1937.

*George B. Russell*, for the appellants.

*Hopkins & Shapiro* [*P. Augustus Hopkins* of counsel], for the respondent Conley.

*Harold F. Lee* [*P. Augustus Hopkins* of counsel], for the respondent Ryan.

*Merchant B. Hall*, for the respondents R. D. Button and others.

*William E. Lounsbury*, for the Federal Land Bank of Springfield, Mass.

PER CURIAM.   The village of Canastota purchased from Romain Button certain lands upon which springs were located, a site for a reservoir or spring house, and the right to lay and maintain water conductors to the Canastota creek and also to the residence of Edwin Bull and others.   There has been a practical location concurred in for forty years as to the land and rights conveyed.   A city may not turn drainage upon lands of another.   (*Noonan* v. *City of Albany*, 79 N. Y. 470; *Fox* v. *City of New Rochelle*, 240 id. 109.)   The village has no greater right to flow Button's land than it would have to flow some other proprietor's premises.   The fact that originally it obtained its title from Button's predecessor does not change the rule.   The judgment should be affirmed, with costs.

HILL, P. J., RHODES, CRAPSER and HEFFERNAN, JJ., concur; BLISS, J., dissents, with an opinion.

BLISS, J. (dissenting).   About fifty years ago the village of Canastota, for the purpose of supplying water to its inhabitants, acquired the waters from four small streams originating in springs on or near the lands of Romain D. Button, the predecessor in title of defendants Button, and the right to divert these waters from their natural westerly course and empty them into a stream which flowed in the opposite direction to the village reservoir.   At the

same time the village entered into an agreement with three lower riparian owners through whose lands these waters naturally flowed, which gave the village the right to divert the waters from their natural channel and conduct them in the opposite direction to their own reservoir forever, or so long as the village might desire and in consideration thereof the village agreed to install and maintain a pipe line and supply running water to these three lower riparian owners as long as it continued to divert the waters. The village has now obtained a supply of water from another source and desires to discontinue its former water supply system and to return the waters from these springs and four small streams to their original channels. It attempted to do this and a dispute arose between it and the lower riparian owners as to its right so to do. The defendants Button contended that one of the four small streams originally flowed in an easterly direction and not westerly across their lands as it now would flow and that the village might not discharge this water upon their land. The referee below found that this stream originally flowed in a westerly course across the lands of Button and we accept this finding as being correct under all of the evidence. The defendants Button also urged that since the diversion by the village they had cultivated and improved their land below the point of diversion so that the original channel is now entirely dry and obliterated, both by time and cultivation, and that to release the waters at the point of diversion and allow them to find their former natural channel through their lands would cause several acres of now valuable land to be flooded and turned into a morass or swale. The learned official referee found in favor of the defendants Button in this respect, holding that the village might not now return the waters to their natural channel because it would do substantial damage to the defendants Button. He also held that the only way this damage could be prevented was by the construction of a new artificial channel across the lands of Button and that this the village might not do because it might not condemn land for such purpose.

As to the three lower owners to whom the village originally agreed to furnish water by a pipe line so long as it continued the diversion, the learned referee held that if the village did not continue to furnish this water it must respond to them in damages because it had placed itself in a position where it was not able to return the waters to their original channel above them on the Button lands and thus relieve itself of its obligation to these lower owners. The matter of damages was left to be determined later and thus the judgment was designated as interlocutory.

We feel that the result reached below as to the defendants Button is erroneous and that the village may now return these waters to their natural channel where they empty upon the Button lands, which is substantially at the points of diversion. This result is sustained both by the terms of the original grant from Button to the village and also by judicial principle and precedent. The grant from Romain D. Button to the village conveyed the waters, together with the right to enter upon the lands and construct and maintain the necessary pipe lines to effect the diversion and then contains the following sentence: " Together with the right to take, use and divert all said springs, streams and water situate and located on said spring lot or so much thereof as shall be necessary for the use of the Canastota Water Works."

It is thus apparent that the parties intended that the village should divert only so much of the water as was necessary for village purposes. It might divert all or none or any amount between these two extremes as its needs dictated and it was not compelled to take any of the water if it did not so desire. The undiverted waters presumably would continue in their original natural channels across the Button lands as well as those of the other lower owners. We see in this grant no intent that the village must continue the diversion for any particular time or in any particular amount.

The easement to divert waters from their natural course exists for the benefit of the dominant tenement alone, to be exercised or discontinued as the owner wills and the failure to exercise the right of diversion gives rise to no cause of action. " The submission to the exercise of an easement by the owner of the dominant estate, for his own purposes and in his own way, does not necessarily give the servient owner a right to the continuance of the easement imposed, because it is attended with incidental advantages to the latter; but the former may, if he chooses, cease to exercise it entirely." (Gould on Waters [3d ed.], § 340.)

" The right of diverting water which in its natural course would flow over or along the land of a riparian owner, and of conveying it to the land of the party diverting it, the *servitus aquæ ducendæ* of the civilians, is an easement well known to the law of this as of every other country. Ordinarily such an easement can be created, according to the law of England, only by grant, or by long continued enjoyment, from which the existence of a former grant may be reasonably presumed. But such a right may, like any other right, be created in derogation of a prior right by the action of the Legislature. It was thus created in the present instance. But, however it may be called into existence, the right is essentially the same.

The legal incidents connected with it are the same, whether the easement is created by grant or by statutory enactment. Now, it is of the essence of such an easement that it exists for the benefit of the dominant tenement alone. Being in its very nature a right created for the benefit of the dominant owner, its exercise by him cannot operate to create a new right for the benefit of the servient owner. Like any other right, its exercise may be discontinued, if it becomes onerous, or ceases to be beneficial, to the party entitled. An easement like the present, while it subjects the owner of the servient tenement to disadvantage by taking from him the use of the water, for the watering of his cattle, the irrigation of his land, the turning of his mill, or other beneficial use to which water may be applied, may, on the other hand, no doubt, be attended incidentally with equal or greater advantage to him, as, for instance, by rendering him safe from the danger of inundation. But this will give him no right to insist on the exercise of the easement on the part of the dominant owner, if the latter finds it expedient to abandon his right. In like manner, where the easement consists in the right to discharge water over the land of another, though the water may be advantageous to the servient tenement, the owner of the latter cannot acquire a right to have it discharged on to his land, if the dominant owner chooses to send the water elsewhere, or to apply it to another purpose." (*Mason* v. *Shrewsbury & Hereford Railway Co.*, L. R. [6 Q. B.] 578. See, also, *Brace* v. *Yale*, 99 Mass. 488; *Longstreet* v. *Harkrader*, 17 Ohio St. 23, and *Peter* v. *Caswell*, 38 id. 518.)

There is nothing in the law to prevent the village from discontinuing the diversion of the waters in question at the points of diversion and permitting them to return to their natural channels at these points.

The judgment should be reversed with costs and judgment granted in favor of the plaintiff against the defendants as prayed for in the complaint, except that it should not be declared that the plaintiffs have any right to enter upon the lands of the defendants for any purpose other than the discontinuance of the diversion at the points of diversion.

Judgment affirmed, with costs.